UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
SOUTHEASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 1:16 CR 6 SNLJ (ACL) |
| | ) | |
| MIKEEM DANIEL, | ) | |
| | ) | |
| Defendant. | ) | |

## 1st AMENDED REPORT AND RECOMMENDATION

This matter was referred to the undersigned United States Magistrate Judge

pursuant to 28 U.S.C. § 636(b).  Pending before the undersigned is Defendant Mikeem

Daniel's Motion to Suppress Physical Evidence and Statements (Doc. 35) obtained

following a stop of a vehicle he was driving on November 18, 2015.  Daniel argues that

the officers lacked specific and articulable facts to justify a *Terry* stop.  *Id.* at 2.  He also

claims that *Terry* did not justify the removal of Daniel from the vehicle and use of

handcuffs.  *Id.* at 3.  Daniel further argues that police officers lacked probable cause or

voluntary consent to conduct the subsequent warrantless search of the vehicle.  Finally,

Daniel claims that his later statements were fruit of the unlawful stop and search.  *Id.*

Daniel requests the suppression of all evidence seized from the vehicle and the statements

he made during two separate interrogations, as well as cash seized from the sole

passenger.  *Id.* at 3-4. The Government filed a Brief in opposition to Daniel's claims.

(Doc. 41.)  After an evidentiary hearing (Doc. 54), both parties submitted memoranda.

(Docs. 59, 62, 67.)

In consideration of the pleadings identified above, as well as all exhibits admitted into evidence, the undersigned recommends that the following findings of fact and conclusions of law be adopted and that the Daniel's Motion to Suppress be denied.

## I. Findings of Fact

On November 18, 2015, close to 11:30 p.m., a 911 call was received by the Perryville Police Dispatcher regarding an armed robbery. Within the first minute of the call, the following exchange took place:

Dispatcher:   911, what is your emergency?

911 Caller:   Uhhh, St. Joe's General Store, I just got robbed at gunpoint.

Dispatcher:   Hold on.

**Dispatch:[1]   (Inaudible)…117?**

911 Caller:   Please hurry! Please hurry!

Dispatcher:   We are, I'm just calling about it now.

911 Caller:   He's going to come back and f—ing kill me—he took my wallet!

**Dispatch:   We've got an armed burglary, St. Joe's General Store...**

Dispatcher:   Is he still there?

911 Caller:   No, he left in a white Suburban. . .

**Dispatch:   He just left in a white Suburban**

Dispatcher:   Do you know what direction of travel?

911 Caller:   He's a black male. Please get somebody here.

---

[1]  For clarity, the statements made by the Dispatcher that were dispatched to officers are in bold and referenced as "Dispatch" to signify the information heard by officers.

| | |
|---|---|
| Dispatcher: | Do you know where he went?  What direction? |
| 911 Caller: | He was on the road behind St. Joe and they were going toward, like the Square. |
| **Dispatch:** | **Suspect is a black male, driving a white Suburban** |
| 911 Caller: | No he wasn't driving, there was somebody else. |
| **Dispatch:** | **There was somebody else driving, left in a white Suburban…** |

**\* \* \***

| | |
|---|---|
| **Dispatch:** | **Caller states they were on the road behind St. Joe's General Store heading towards the Square.** |

(Govt. Ex. #1, DVD, file "232957sa. . ." at 00:00-01:16.)  Within less than one minute, the Dispatcher advised all officers that there had been an armed burglary at the St. Joe's General Store; and that the robber, a black male, fled in a white Suburban that was driven by someone else.  Another twenty seconds later the direction of travel was dispatched.

Perry County Deputy Rusty Farrar was one of the officers listening to the dispatches.  He was parked at a convenience store located approximately one mile from the St. Joe's General Store.  He immediately headed south on North Perryville Road, toward the Store, at which time he spotted a white Suburban in the oncoming lane of traffic.  Deputy Farrar quickly turned around and followed the white Suburban.  He was able to stop the Suburban less than two minutes after the 911 call had been initiated.  He called out the traffic stop on his radio.

Just before the stop, Deputy Farrar encountered only three other cars in addition to the Suburban.  Two of the cars were in front of him before he turned around to follow the

Suburban.  He then passed a third car in the oncoming traffic lane just moments before following the Suburban onto Old St. Mary's Road.  Otherwise, no additional traffic was observed on one of the town's main thoroughfares when Deputy Farrar saw the Suburban.[2]  *See* Def's. Ex. G[3] at 00:00-00:31 and Govt. Ex. #4.[4]  It was 11:30 at night, in a small town.

Responding officers asked the Dispatcher the age of the vehicle.  The 911 Caller described the getaway vehicle as "newer, it was white" and "[i]t was not a box style, it was more of a round style,. . .and it was big."  (Govt. Ex. #1, DVD, file "232957sa. . ." at at 1:49-2:10).  The 911 Caller's more detailed description of the Suburban was relayed within two minutes of the 911 call coming in.  That description can be heard on the dash cam video recording from Deputy Farrar's patrol vehicle.  Almost simultaneously, Deputy Farrar calls in the license plate number of the Suburban to the County dispatcher.  The County Dispatcher replied to Deputy Farrar, "just be advised that I just got a 911 call of a white Suburban—black male in a passenger seat—could be a possible person that just robbed a store at gunpoint—be careful."  (Def's. Ex. G at 01:27-01:39; Govt. Ex. #1,

---

[2]  It is also worth mentioning that after the Suburban was stopped on Old St. Mary's Road only a few cars passed by the Suburban during the forty minutes is was parked on the side of the road.  *See* Def's. Ex. G.

[3]  All excerpts taken from Def's. Ex. G will be from the following file name, "01F446B82015111823165501," which is the actual dash cam recording from Deputy Farrar's patrol car.

[4]  Government  Exhibit #4 is a map of the City of Perryville.  Deputy Farrar was parked at the location marked with a "3," he stopped the Suburban at the location marked "2," and St. Joe's General Store is situated in the area marked with a "1."  The Square is located at the intersection of St. Joseph Street and Main Street.

DVD, file "23314sa. . ." at 00:53-01:05.)  Deputy Farrar stated that he'd heard the original robbery dispatch.

Approximately two minutes and twenty seconds after the Suburban was stopped, backup officers arrived and Deputy Farrar approached the driver's side of the Suburban. The driver had the window down, which allowed Deputy Farrar to see that both the driver and passenger were black males; there were no other people in the Suburban.  Deputy Farrar maintained communication with the occupants of the Suburban until Perryville Police Department officers (Officer James, badge #107; and Officer Bain, badge #117) arrived on the scene and assumed control of the investigation, as they were the agency with primary jurisdiction.  The driver and passenger were described as being uncooperative and would not exit the vehicle.

The Perryville officers arrived roughly six minutes after the 911 call was initiated. Around that same time, an officer asked the Dispatcher to get a description of the suspect from the 911 Caller.  The Dispatcher asked the 911 Caller various questions about what happened.  The caller provided the following information:

> He wouldn't let me see his face.  He had a black jacket on and he was black and he was skinny.  He was about, uhh maybe a couple of inches taller than me.
>
> *   *   *
>
> He came in the back door and grabbed me by my neck and put a gun against my back and ummm, said "give me the money, give me the money," and pushed me over to the cash register and told me to open it, take it all out for him, and I did, but there wasn't, there's not a lot in there.
>
> *   *   *
>
> He put his arm around me and he put a gun against my back.  I can

still feel the gun in my back right now.

(Govt. Ex. #1, DVD, file "232957sa. . ." at 06:10-07:19.)

Shortly after Officer Bain and Officer James approached the Suburban, the officers looked into the rear windows with their flashlights. Officer James told Officer Bain that he saw a woman's wallet laying in the backseat and pointed it out. (Suppression Hearing Transcript, Doc. 54 at 33, hereinafter "Tr. at ___.") Officer Bain shone his flashlight through the window and was also able to observe the wallet "on the floorboard. . .behind the driver's seat." (Tr. 11, 18-19.) Officer Bain left the Suburban to return to the Store to communicate with the 911 Caller; he arrived back at the Store within less than eleven minutes after the 911 call was initiated. (Govt. Ex. #1, DVD, file "233916sa…")

Roughly eight minutes after the 911 call was initiated, Officer James asked the passenger to get out of the Suburban. The passenger was patted down for weapons, handcuffed and taken to a patrol car.

One minute later, roughly nine minutes after the 911 call was initiated, the driver's door was opened and Daniel exited the vehicle. Daniel communicated with two Perry County Deputies after he exited the vehicle. (Def's. Ex. G at 8:07; the dash cam video depicts only what was visible outside of the patrol car, the only audio is the dispatch communications and music playing on the patrol car's radio). Daniel was patted down by Deputy Farrar for the safety of all involved. Officer James was on the passenger side of the Suburban when Daniel was asked to exit the Suburban. Officer James then walked over to the driver's side of the Suburban. *Id*. at 8:11-8:21. Although Officer James steps

out of view of Deputy Farrar's dash cam, the testimony of Officer James and Daniel's body language support that Officer James assumed the role of questioning Daniel.

While Officer James conversed with Daniel, Deputy Farrar placed Daniel in handcuffs. Officer James asked Daniel for consent to search the vehicle and Daniel initially replied that it wasn't his vehicle and he wouldn't give consent. Officer James advised Daniel that "since he was in operation and control of the vehicle that he could give [ ] consent and then he agreed to allow [Officer James] to search." (Tr. at 36.) *See also* Tr. 52-53. Daniel's facial expression and body language appears consistent with him being unhappy about being asked to exit the vehicle; he raised his hands out to his side in a questioning manner and he directly engages the officers in conversation in an emphatic manner. Although unhappy, Daniel cooperated with the officers once he got out of the vehicle. As he continues to communicate with the officers he nods, drops, and shakes his head during the course of the conversation.

After roughly 90 seconds of the driver's door being opened, Daniel lightly shrugged his shoulders and moved away from the open driver's door while tapping his fingertips behind his back, *id*. at 9:25-9:31, thereby allowing Officer James access to the driver's area of the Suburban. Officer James could not recall the exact wording of Daniel's consent, stating "[h]e made it very clear that I had consent. He could have said yes, he could have said go ahead, but I did receive consent." (Tr. 53.) Officer James initiated a search of the Suburban; and, a moment later reported to dispatch, "I've got consent to search the vehicle." (Def's. Ex. G at 9:48.) When Officer James made that statement, he and Daniel were in close proximity to each other—Officer James was at the

left rear passenger door of the Suburban and Daniel was standing at the rear of the Suburban. Daniel stood silently by and did not disagree with the statement. While the search was being conducted, Daniel along with Deputy Farrar and another Perry County Deputy stood at the rear of the Suburban; Daniel engaged in conversation with the deputies when they spoke to him. Daniel swayed and stepped from side to side on occasion during the search in a manner that appeared nervous. He never objected to the search.

Around the same time Daniel exited the Suburban, the 911 Caller gave more details about what happened, as follows:

> He took me back to the back door after I gave him the money out of the drawer and, um, . He grabbed my wallet off the counter. I thought he was going to take me with him and I seen the, the white vehicle driving . . .I seen the white vehicle driving really slow on the road and he pushed me away from the door where he was.

(Govt. Ex. #1, DVD, file "232957sa. . ." at 08:58-09:24.) The Dispatcher then advised the 911 Caller that Officer Bain was outside the Store. (Govt. Ex. #1, DVD, file "233916sa…")

Upon returning to the Store, Officer Bain asked the Dispatcher to advise Officer James "that the suspect will be a black male, probably, approximately 5 (inaudible), 5-4, he was seen wearing a black sweatshirt or hoodie." (Govt. Ex. #1, DVD, file "234204sa…" at 00:23-00:44.) That information was dispatched as, "be a black male, 5-4, black sweatshirt, a hoodie." *Id*. at 00:40-00:44, *see also* Def's. Ex. G at 11:48. Next, Officer Bain and Officer James communicated with each other by cell phone and Officer

Bain relayed firsthand information regarding the robbery from the 911 Caller and review of the Store's surveillance video. That information included the fact that the robber took the 911 Caller's wallet.

Less than five minutes after exiting the Suburban, Daniel was assisted to a patrol car (Def's. Ex. G at 13:34.) Officer James had the 911 Caller's wallet in his possession at that time. The search of the Suburban continued and officers maintained control of the Suburban until a supervisory Detective arrived to assist with packaging the evidence, including the nine millimeter Hi Point revolver that was found in a hidden compartment in the center console. The following items were seized from the Suburban: the 911 caller's wallet, a Hi Point nine millimeter revolver, and a hooded sweatshirt, or jacket. In addition, $349 was seized from the passenger's pocket (approximately the same amount of money that was taken from the St. Joe's General Store).

The Suburban was photographed at the Perryville Police Department impound. The photographs submitted by Daniel confirm that all the windows behind the driver and passenger seats were tinted. (Def's. Ex. A-D.) Defendant's Exhibit B reveals that although the rear windows were tinted it was possible to see in the vehicle, as the front passenger bucket seat is visible through the right rear passenger's window. There is no doubt that with the use of a flashlight it would be possible to see through the windows and into the backseat of the Suburban. Several of the officers utilized flashlights to look through the windows of the Suburban. Officers Bain and James testified that they could see a woman's wallet, situated behind the driver's seat, through the windows of the Suburban after they approached it. (Tr. at 11, 33.) When Detective Lanier arrived on the

scene to package the evidence that had been located, Officer James advised, "her wallet was underneath the driver's seat. I saw that before we even pulled the[ subjects] out." (Def's. Ex. H, Body Cam #2, DVD, at 08:15.)

On the night in question, Officer James was wearing a body camera that was capable of acting as a videorecorder or a digital camera; according to Perryville Police Department policy the body camera should be used during interactions with suspects. The only recording made by Officer James' body camera during the traffic stop is from the time Officer James entered the Suburban to secure the nine millimeter handgun until the officers were preparing to transport the suspects to the jail. Officer James testified that he believed his body camera was on throughout the traffic stop, however, it turned out the recorder either hadn't been turned on, it was not functioning, or he "possibly didn't use it correctly." (Tr. 52.)

Although Officer James did not recall Daniel stating that the Suburban belonged to his girlfriend, he did recall Daniel stating "he was on his way to his girlfriend's that lives on Fairview." (Tr. 49.) The night of the incident a Dispatcher confirmed the plate returned to Cheyenne Graham (Def.'s Ex. G at 28:01-28:14), but at a Sycamore Road address, *id.* at 28:50, not Fairview. Officer James incorrectly testified that he was the person who patted down and handcuffed Daniel as it is clear from the dash cam video that Deputy Farrar performed those actions. Although Officer James was mistaken about who physically conducted the pat down and handcuffing of Daniel, Officer James was present and communicating with Daniel while those procedures happened. Less than twenty seconds after initiating his search of the Suburban Officer James reported to

dispatch that he had received consent to search. The undersigned finds that Officer James' testimony regarding consent being given by Daniel is credible.

## II. Conclusions of Law

The undersigned concludes that Deputy Farrar had reasonable suspicion to stop the Suburban; that the subsequent removal, pat down search, and handcuffing of Daniel was reasonable to protect the safety of the officers; and that Daniel voluntarily consented to a search of the Suburban. As a result, the stop of the Suburban was lawful and all the evidence seized following the stop is admissible at trial. A more thorough analysis follows.

### II.A. The Initial Stop of the Suburban was a valid *Terry* stop.

Daniel's first argument is that the initial stop of the Suburban was unlawful based on allegations that Deputy Farrar was "follow[ing] up on a hunch" and did not have "specific and articulable facts" to justify the stop. (Doc. 59 at 4.)

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures..." U.S. Const. amend. IV. In *Terry v. Ohio*, 392 U.S. 1, 30 (1968), the Court held that an officer may, consistent with the Fourth Amendment, conduct a brief investigatory stop when the officer has a reasonable, articulable suspicion based on his experience that criminal activity is afoot. *See also United States v. Bell*, 183 F.3d 746, 749 (8th Cir.1999) (An investigative stop of a vehicle "does not violate the Fourth Amendment if the police have reasonable suspicion that the vehicle or its occupants are involved in criminal activity.").

There is no requirement that there be a traffic violation. *See Alabama v. White*, 496 U.S. 325 (1990) (upholding stop of vehicle in absence of traffic violation).

The level of suspicion required to justify a stop is "considerably less than proof of wrongdoing by a preponderance of the evidence" and must be evaluated under "the totality of the circumstances." *United States v. Sokolow*, 490 U.S. 1, 7-8 (1989). Reasonable suspicion is a particularized and objective basis for suspecting the person stopped of criminal activity. *United States v. Thomas*, 249 F.3d 725, 729 (8th Cir. 2001). Whether there is reasonable suspicion to justify a *Terry* stop depends upon the totality of the circumstances, including the information known to the officer and any reasonable inferences to be drawn at the time of the stop. *United States v. Arvizu*, 534 U.S. 266, 273-74 (2002). "Reasonable suspicion is based on 'specific and articulable facts,' *Terry*, 392 U.S. at 21, which are considered collectively and "in light of the significance that a law enforcement officer experienced in detecting criminal activity would attach to them." *United States v. Quarles*, 955 F.2d 498, 501 (8th Cir. 1992) (citing *United States v. Turpin*, 920 F.2d 1377, 1385 (8th Cir. 1990)). "The 'reasonable suspicion' necessary to justify [a *Terry*] stop is dependent upon both the content of the information possessed by the police and its degree of reliability.'" *Navarette v. California*, 134 S.Ct. 1683, 1687 (2014) (quoting *Alabama v. White*, 496 U.S. 325, 330 (1999)). "A reasonable suspicion may be justified even if there are innocent explanations for a defendant's behavior when the circumstances are considered in their totality." *United States v. Tutley*, 161 F.3d 513, 515 (8th Cir. 1998) (per curiam).

"Because reasonable suspicion is a less demanding standard than the probable cause required for an arrest, it 'can arise from information that is less reliable than that required to show probable cause…'" *United States v. Wheat*, 278 F.3d 722, 726 (8th Cir. 2001) (quoting *Alabama v. White*, 496 U.S. 325, 330 (1990)). "A tip from a known informant can suffice by itself to establish reasonable suspicion" for a *Terry* stop, even if the police do not corroborate the tip prior to the stop with their own independent observation." *United States v. Spotts*, 275 F.3d 714, 720 (8th Cir. 2002) (citing *Adams v. Williams*, 407 U.S. 143, 146-47 (1972)). "An anonymous tip can also provide reasonable suspicion by itself, but only if it is sufficiently corroborated at the time of the stop." *Id*. (interim citations omitted). *See also Navarette*, 134 S.Ct. 1689 (reliability factors for tip from 911 caller included: the caller claimed eyewitness knowledge of allegedly dangerous activity (drunk driving), the caller's statement was made "soon after perceiving the event," rendering it "especially trustworthy," and the call was made through the 911 system, which "has some features that allow for identifying and tracing callers,. . .provid[ing] some safeguards against making false reports").

In *United States v. Juvenile TK*, 134 F.3d 899 (8th Cir.1998), reasonable suspicion was found where officers stopped a "gray vehicle" less than two blocks from the location of where a man had been seen brandishing a weapon five minutes earlier. Forty minutes earlier the officers heard a dispatch regarding an incident involving a man breaking out a car window and then getting into a "gray vehicle." Five minutes after the gun brandishing incident, two officers observed a "gray vehicle" two blocks from where the man reportedly brandished a weapon. They turned around to follow the "gray vehicle"

and turned on the patrol car's red lights. When they did so, the "gray vehicle" made a quick turn and accelerated but did not commit and traffic violations. The Eighth Circuit found that an analysis of the "temporal and geographic proximity of [a getaway car] to the scene of the crime, the matching description of the vehicle, and the time of the stop," may support a finding of reasonable suspicion. *Juvenile TK*, 134 F.3d at 903.

After deciding *Juvenile TK*, the Eighth Circuit held an officer had "more than enough" reasonable suspicion to stop a vehicle in *United States v. Walker*, 771 F.3d 449, 451 (8th Cir. 2014), *cert. denied* 135 S.Ct. 1538 (2015), where a 911 caller reported a drive-by shooting by two black males who drove off in a "Suburban." In *Walker*, an officer who was on patrol nearby heard the dispatch and knew that the address where the drive-by shooting occurred was the residence of a witness in a murder investigation; he also knew that a suspect in that murder case lived two or three blocks away. Roughly one minute after hearing the dispatch, the officer saw a Suburban back out of the driveway of the suspect who lived two or three blocks away. He stopped the Suburban. The Eighth Circuit reasoned:

> Here, as in *TK*, police were responding to reports of "clearly criminal activity," *id*. at 904, a drive-by shooting at the residence of a witness in a murder investigation. A Suburban was reported leaving the scene of this early morning crime. [The responding o]fficer [ ] spotted a Suburban leaving the driveway of a suspect in the investigation, a short distance from the reported shooting. All this was more than enough reasonable suspicion to stop the Suburban and investigate its occupants.

*Walker*, 771 F.3d at 451. *See also U.S. v. Quinn* 812 F.3d 694 (8th Cir. 2016) (affirming denial of suppression motion where officers stopped defendant roughly forty minutes

after officers saw suspects flee the crime scene and within a few blocks of the wreck of the stolen car).

In this case, Deputy Farrar had reasonable suspicion that the white Suburban and the occupants of the vehicle may have been involved in criminal activity. He heard two separate dispatches regarding an armed robbery that had just occurred with the suspect leaving the robbery in a white Suburban. The robbery report came from a 911 caller, a store clerk, who was the victim of the armed robbery of the St. Joe's General Store. She reported the event as soon as the robber fled and she was able to tell the Dispatcher that the robber was a black male passenger and the getaway vehicle was a white Suburban driven by another person. Deputy Farrar was only one mile from the location of the robbery. Within less than two minutes of the robbery being reported on the radio he saw a white Suburban. The 911 Caller reported that the robber was the passenger in a white Suburban and that the robber committed the crime with a firearm. The most significant factors in this case are the Suburban's temporal and geographic proximity to the crime scene late in the evening when there was very little traffic on the roadway. The Suburban was spotted approximately one mile from the location of the robbery and within less than two minutes of the initiation of the 911 call. Of the four cars encountered by Deputy Farrar's patrol car immediately prior to the stop, only one was a white Suburban. Although the caller believed the Suburban was headed away from Deputy Farrar's location immediately after the robbery, according to the map of the area there were numerous routes the driver could have taken to quickly change direction to northerly travel rather than easterly travel toward the Square. *See* Gov't. Ex. #4.

The record here supports that Deputy Farrar was acting on more than a mere hunch when he stopped the Suburban. As the Supreme Court emphasized in *Terry*, "it is imperative that the facts be judged against an objective standard:  would the facts available to the officer at the moment of the seizure or search 'warrant a man of reasonable caution in the belief' that that the action taken was appropriate?"  *Terry*, 392 U.S. at 21-22.  In this case, the report of the armed robbery by a passenger in a white Suburban roughly one mile from Deputy Farrar's location within roughly a couple of minutes of the crime being committed, with virtually no other traffic in the area, warranted Deputy Farrar's decision to stop the Suburban.  The failure of a law enforcement officer to stop the Suburban under these circumstances is unfathomable. The Court finds the stop of the Suburban was according to law and constitutional.

**II.B.   Removal of Defendant from vehicle and use of handcuffs was reasonable to protect the safety of the officers.**

Daniel also claims that "the removal of Mr. Daniel from the vehicle, placing him in handcuffs and searching the vehicle" was not justified under *Terry*.  (Doc. 35 at 3.) After Deputy Farrar stopped the Suburban, he remained in his patrol car until backup officers arrived.   After their arrival, Deputy Farrar approached the driver's side of the Suburban and he was able to confirm that the passenger was a black male and the only other occupant of the vehicle was the driver, Daniel.  Shortly thereafter, the Perryville Police Officers arrived and assumed control of the investigation.

A suspect may be frisked for the safety of the police and others, after a valid *Terry* stop has been made by police officers.  *Pennsylvania v. Mimms*, 434 U.S. 106, 111-12

(1977); *United States v. Roggeman*, 279 F.3d 573, 579-80 (8th Cir. 2002).  Officers must

use "the least intrusive means reasonably available to verify or dispel [their] suspicion[s]

in a short period of time." *Florida v. Royer*, 460 U.S. 491, 500 (1983).  The Supreme

Court stated that "there must be a narrowly drawn authority to permit a reasonable search

for weapons for the protection of the police officer, where he has reason to believe that he

is dealing with an armed and dangerous individual, regardless of whether he has probable

cause to arrest the individual for a crime." *Terry*, 392 U.S. at 27. *See also United States v.*

*Navarrete–Barron*, 192 F.3d 786, 790 (8th Cir.1999).  "[A]s part of a lawful *Terry* stop,

officers may take any measures that are 'reasonably necessary to protect their personal

safety and to maintain the status quo during the course of the stop.'" *United States v.*

*Smith,* 648 F.3d 654, 659 (8th Cir.2011) (citations omitted).  "We are now concerned

with more than the governmental interest in investigating crime; in addition, there is the

more immediate interest of the police officer in taking steps to assure himself that the

person with whom he is dealing is not armed with a weapon that could unexpectedly and

fatally be used against him." *Terry*, 392 U.S. at 23.  "The officer need not be absolutely

certain that the individual is armed; the issue is whether a reasonably prudent man in the

circumstances would be warranted in the belief that his safety or that of others was in

danger." *Id*. at 27 (citations omitted).

In *Pennsylvania v. Mimms*, the Supreme Court ruled that the "legitimate and

weighty" interest in protecting the safety of a police officer outweighed the "de minimis"

intrusion on the liberty of the citizen and justifies requiring a driver to exit an automobile.

*Pennsylvania v. Mimms*, 434 U.S. 106, 108-111 (1977).  To achieve the purpose of a

*Terry* stop, officers must use the least intrusive means of detention and investigation. *See United States v. Navarrette-Barron*, 192 F.3d 786, 790 (8th Cir, 1999) (citing *Florida v. Royer*, 460 U.S. 491, 500 (1983)). Thus, "[a] *Terry* stop may turn into an arrest if the stop lasts for an unreasonably long time or if the officers use unreasonable force." *Id.* (citing *Dunaway v. New York*, 442 U.S. 200, 212 (1979)), *see also United States v. Newell*, 596 F.3d 876, 879 (8th Cir.2010) (quoting *United States v. Navarrete–Barron*, 192 F.3d 786, 790 (8th Cir.1999)).

"[W]hen officers are presented with serious danger in the course of carrying out an investigative detention, they may brandish weapons or even constrain the suspect with handcuffs in order to control the scene and protect their safety." *United States v. Fisher*, 364 F.3d 970, 973 (8th Cir.2004). *See United States v. Martinez*, 462 F.3d 903, 907 (8th Cir. 2006) (use of handcuffs can be a reasonable precaution during a *Terry* stop). The "sole justification" for frisking a suspect is the protection and safety of the officers and others. *United States v. Roggeman*, 279 F.3d 573, 577 (8th Cir. 2002) (quoting *Terry*, 392 U.S. at 29).

Deputy Farrar faced an extremely dangerous situation after stopping the Suburban that contained occupants who were reasonably suspected of being involved in an armed robbery. Based on the geographic and temporal proximity of the Suburban to the location and time of the robbery it was highly possible the people in the vehicle were armed and dangerous. The removal of Daniel from the Suburban, the pat down of his person, and use of handcuffs to secure Daniel during the search was the least intrusive means reasonably necessary to protect the officers, and allow them to conduct the search

of the vehicle immediately and without interference.  The detention did not last for an

unreasonably long time—the time that lapsed between the removal of Daniel from the

Suburban and the time he was taken to the police car following the seizure of the 911

Caller's wallet, was slightly more than five minutes.

**II.C.   The Defendant consented to a search of the Suburban.**

As previously stated, Daniel also claims that after the Suburban was stopped "the

subsequent search of the vehicle was neither justified by probable cause nor voluntary

consent."  (Doc. 59 at 1.)  The Government argues Officer James executed a valid search

of Defendant's vehicle pursuant to his consent. Daniel denies having given consent.

Law enforcement may search a motor vehicle, even in the absence of a warrant or

probable cause, if a person authorized to give consent does so. *Schneckloth v.*

*Bustamonte,* 412 U.S. 218, 222 (1973). Such consent is an exception to the Fourth

Amendment's warrant requirement.  *Id.*  The Court considers the totality of the

circumstances in determining whether consent is voluntary.  *United States v. Gipp,* 147

F.3d 680, 685 (8th Cir.1998).  The burden of proving by a preponderance of the evidence

that a search is consensual falls on the Government.  *United States v. Cedano–Medina,*

366 F.3d 682, 684 (8th Cir.2004). In determining whether a suspect has voluntarily given

consent, the Court considers various factors, including:

> personal characteristics of the defendant, such as age, education, intelligence,
> sobriety, and experience with the law; and features of the context in which the
> consent was given, such as the length of detention or questioning, the substance
> of any discussion between the defendant and police preceding the consent,
> whether the defendant was free to leave or was subject to restraint, and whether
> the defendant's contemporaneous reaction to the search was consistent with

consent.

*United States v. Jones,* 254 F.3d 692, 696 (8th Cir.2001) (citing *United States v. Hathcock,* 103 F.3d 715, 719–20 (8th Cir.1997)).

The question of voluntariness does not depend exclusively on whether law enforcement advised a suspect that he could withhold his consent. *Ohio v. Robinette,* 519 U.S. 33, 39–40 (1996) (citation omitted.) ("[S]o too would it be unrealistic to require police officers to always inform detainees that they are free to go before a consent to search may be deemed voluntary."); *Schneckloth,* 412 U.S. at 227 ("[T]he government need not establish such knowledge as the *sine qua non* of an effective consent."); *see also United States v. Drayton,* 536 U.S. 194, 206 (2002) (acknowledging that the Supreme Court "has rejected in specific terms the suggestion that police officers must always inform citizens of their right to refuse when seeking permission to conduct a warrantless consent search."); *United States v. Siwek,* 453 F.3d 1079, 1084 (8th Cir. 2006) (citation omitted). Nor is law enforcement categorically obligated to provide a suspect with a consent-to-search form. *See Siwek,* 453 F.3d at 1084 (citing *United States v. Carrate,* 122 F.3d 666, 670 (8th Cir.1997)).

The paramount inquiry in determining whether consent is freely and voluntarily given is "whether, in light of the totality of the circumstances, consent was given without coercion, express or implied." *United States v. Sanders,* 424 F.3d 768, 773 (8th Cir. 2005) (citing *Schneckloth,* 412 U.S. at 227)).

The Court's careful review of the videotaped traffic stop in combination with Officer James' credible testimony clearly indicates Daniel voluntarily consented to the

search of the Suburban.  In consideration of the totality of the circumstances, the Court notes that Daniel was confident and direct in his communications with the officers. He appeared alert, sober, and lucid throughout the very brief period during which the officers explained the situation and Officer James asked for consent. No officer drew a gun, nor did any officer act aggressively toward Daniel.  Fewer than three minutes elapsed between the time that Daniel was removed from his car and the car was searched, and at no point did any officer threaten or attempt to coerce Daniel.

Most telling, however, is the way in which Daniel reacted when Officer James entered the driver's side door to initiate the search.  Daniel calmly stepped aside and remained quiet. As the search progressed, the video clearly portrays Daniel standing by and watching the actions of Officer James. That "contemporaneous reaction" is clearly consistent with the testimony that Daniel gave his consent voluntarily and never withdrew his consent.  In addition, when Officer James reported to dispatch that he'd received consent to search, Daniel was standing very close by and did not disagree.

Based on the totality of the circumstances, Daniel's consent to the search of the Suburban was voluntarily and knowingly made.  As a result, his Motion to Suppress the physical evidence seized from the Suburban and the passenger's pocket should be denied.

**II.D. Alternatively,[5] the search was supported by probable cause.**

An alternative ground to support Officer James' search of the Suburban, although

it is akin to the "bare-bones" probable cause finding[6] in *United States v. Murphy*, 69 F.3d

237 (8th Cir. 1995), is that the search was supported by probable cause.

---

[5]  The Government's secondary argument in support of the search of the Suburban is that "[t]he knowledge of all the officers, including the dispatcher, can be considered as collective knowledge for the purposes of determining whether there was probable cause to search the Suburban." (Doc. 62 at 23.)  The Eighth Circuit has repeatedly held that it is not necessary for a single officer to personally possess all the relevant information justifying a stop, arrest, or search when the collective knowledge of all the officers working the case establishes reasonable suspicion or probable cause.  Instead there is a "presum[ption] that the officers have shared relevant knowledge which informs the decision to seize evidence or to detain a particular person, even if the acting officer is unable to completely and correctly articulate the grounds for his suspicion at the time of the search." *United States v. Riley*, 927 F.2d 1045, 1049 (8th Cir. 1991) (citations omitted).  The 911 Caller told the Dispatcher three separate times during the 911 call that the robber who fled in the Suburban had stolen her wallet and two officers observed a woman's wallet under the driver's seat prior to the search of the Suburban.  Observing the wallet under the driver's seat was an unusual location for a woman's wallet to be stowed particularly when there was not a female in the vehicle.  The Dispatcher's knowledge regarding the wallet combined with the on scene officers' observation of a woman's wallet on the floorboard under the driver's seat is an additional fact to support Officer James had probable cause to conduct a warrantless search of the Suburban. *But see United States v. Colon*, 250 F.3d 130, 135-138 (2d Cir. 2001).  The undersigned shares the same reluctance in applying the collective knowledge test as expressed by the Honorable Circuit Judge McMillian in *United States v. Wright*, 641 F.2d 602, 606 at fn 4 (8th Cir. 1981) (citation omitted), "unless there is evidence of actual communication [between the officers] or unless the officer who had the information ordered or directed the other officer to act"; although the trend in the case law does not require such a showing.  At the same time, the undersigned recognizes that the "collective knowledge doctrine" is, in part, supported by the general rule that "[t]he test for probable cause is not the articulation of the policeman's subjective theory but the objective view of the facts." *White v. United States*, 448 F.2d 250, 254 (8th Cir. 1971) (citations omitted).

[6]  In *Murphy*, an officer prepared a search warrant that simply said he believed there would be firearms in the residence of a subject who had recently been released from prison for murder.  The officer made this conclusion based on an informant's statement that the informant had seen the subject with firearms in the residence.  The Eighth Circuit held that the affidavit contained the minimal corroborating facts needed to find there was probable cause that evidence of a crime would be found at the residence.  The two corroborating facts offered in the affidavit were simply that the subject of the warrant lived in the house identified by the informant and the suspect had been released on parole as stated by the informant.

The automobile exception to the Fourth Amendment allows police officers to conduct a warrantless search of a vehicle if, at the time of the search, "they have probable cause to believe that the vehicle contains contraband or other evidence of a crime." *United States v. Kennedy,* 427 F.3d 1136, 1140–41 (8th Cir.2005). "Probable cause sufficient to justify a search exists where, in the totality of the circumstances, there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Id.* at 1141. The instant case is similar to *Chambers v. Maroney*, 399 U.S. 42, 47 (1970), where "the police had probable cause to believe that the robbers, carrying guns and the fruits of the crime, had fled the crime scene in a light blue compact station wagon which would be carrying four men, one wearing a green sweater and another wearing a trench coat." The men in the station wagon were found within an hour of the information being broadcast over a police radio, *id*. at 44, a much longer period of time than what was involved in the instant case.

When Officer James initiated the search of the Suburban, he knew that the St. Joe's General Store had been robbed by a black male who used a firearm. The robber left the Store in a large white Suburban that was being driven by another person. The Suburban was stopped approximately one mile from the location of the robbery within less than two minutes of the 911 report. The occupants of the Suburban included a driver and a black male passenger as described by the 911 caller. There was very little traffic on the main roadway of the town where Officer James encountered the Suburban as it was late at night. The significant facts in this case include: the Suburban was stopped quickly--within less than two minutes of the robbery being reported; the Suburban was

encountered by the officer who stopped it in close proximity to the location of the robbery as the Store was just one mile away; the occupants of the Suburban were as described by the 911 caller--a driver, black male passenger, and no other occupants; and it was late at night with very few other vehicles on the roadway of a small town. Although it is a close call, these things in combination made it very likely that the gun and evidence related to the robbery would be found in the Suburban driven by Daniel. Under the totality of the circumstances in this case, Officer James had probable cause to believe the Suburban contained evidence of the armed robbery that occurred at the St. Joe's General Store.

**II.E.   The Defendant's Statements**

Daniel also requests suppression of statements he made to law enforcement officers during two separate interrogations following his arrest based on a claim that his statements were "the fruit of the unlawful stop, search and arrest, and therefore, also inadmissible."  (Doc.59 at 1.)  "[T]he exclusionary rule reaches not only primary evidence obtained as a direct result of an illegal search or seizure, but also evidence later discovered and found to be derivative of an illegality or 'fruit of the poisonous tree.'" *United States v. Riesselman*, 646 F.3d 1072, 1078 (8th Cir. 2011), quoting *Segura v. United States*, 468 U.S. 796, 804 (1984).  "[T]he defendant bears the initial burden of establishing the factual nexus between the constitutional violation and the challenged evidence."  *United States v. Marasco*, 487 F.3d 543, 547 (8th Cir. 2007).

In this case, because the stop of the Suburban and subsequent search did not violate Daniel's constitutional rights, his admissions were not fruit of the poisonous tree.

*See United States v. Goodale*, 738 F.3d 917, 922 (8th Cir. 2013).  Daniel did not argue that his statements were involuntary or that there was a violation of *Miranda v. Arizona*, 384 U.S. 436, 448-450 (1966), so those issues are not considered.  Daniel's Motion to Suppress Statements should be denied.

### III. Conclusion

In accordance with the Memorandum above,

**IT IS HEREBY RECOMMENDED** that Daniel's Motion to Suppress Physical Evidence and Statements (Doc. 35) be **denied**.

Further, the parties are advised that they have fourteen days in which to file written objections to this Report and Recommendation, unless an extension of time for good cause is obtained.  Failure to file timely objections may result in a waiver of the right to appeal questions of fact.  *Thompson v. Nix*, 897 F.2d 356 (8th Cir. 1990).

s/Abbie Crites-Leoni
United States Magistrate Judge

Dated this 7th day of July, 2016